STATE OF MONTANA,

Plaintiff and Respondent,

v.

RODNEY JOSEPH SATTLER,

Defendant and Appellant.

Nos. 96-285 & 96-305.

Argued September 9, 1997.

Submitted November 4, 1997.

Decided March 11, 1998.

1998 MT 57.

Appeal from the District Court of Lake County.

Twentieth Judicial District.

Honorable C. B. McNeil, Judge.


Affirmed.

JUSTICES LEAPHART, TRIEWEILER and HUNT specially concur.

For Appellant: Edmund F. Sheehy, Jr. (argued); Cannon & Sheehy, Helena.

For Respondent: Hon. Joseph P. Mazurek, Attorney General; Jennifer Anders (argued), John

P. Connor Jr., Assistant Attorneys General, Helena; Deborah Kim Christopher; Lake County

STATE OF MONTANA,

JUSTICE GRAY delivered the Opinion of the Court.

¶1 Rodney Joseph Sattler (Sattler) appeals from the judgment and death sentence entered by the Twentieth Judicial District Court, Lake County, on a jury verdict finding him guilty of the offense of deliberate homicide. Sattler raises both trial-related and death penalty-related issues and, pursuant to § 46-18-308, MCA, his appeal is consolidated with this Court's automatic review of a death penalty case. We affirm. [288 Mont. 86]

¶2 We address the following issues:

¶3 1. Did the District Court abuse its discretion by limiting Sattler's questioning of prospective jurors during voir dire?

¶4 2. Did the District Court abuse its discretion by refusing to allow Sattler to inquire into the reason the victim had been at the Pine Hills youth correctional facility?

¶5 3. Was there sufficient evidence to support the conviction?

¶6 4. Did the District Court commit reversible error in analyzing aggravating or mitigating

circumstances?

¶7 5. Was the death sentence imposed under the influence of passion, prejudice or any other arbitrary factor?

¶8 6. Is the death sentence imposed disproportionate to the penalty imposed in similar cases?

¶9 7. Are the District Court's findings regarding the existence of the aggravating circumstance set forth in § 46-18-303(2), MCA, and the nonexistence of any mitigating circumstances supported by the evidence?

BACKGROUND

¶10 On May 2, 1995, the State of Montana (State) charged Sattler by information with committing the offense of deliberate homicide in violation of § 45-5-102(1)(a), MCA. The facts alleged in support of the charge were that, on or about April 20, 1995, Sattler purposely or knowingly caused the death of Raymond Carl Martinson (Martinson) by beating him to death with a blunt instrument. Both were incarcerated in the Lake County Jail (Jail) at the time of the charged offense. Sattler had been convicted of deliberate homicide in 1987 and incarcerated in the Montana State Prison (MSP); he subsequently was moved to the Swan River Correctional

Training Center (Swan River). At the time of the incident on which the deliberate homicide charge

in this case was based, Sattler was being held in the Jail as the result of an attempted deliberate

homicide committed by him at Swan River. Sattler pleaded not guilty to the charge in the present

case and gave notice of his intent to rely on the affirmative defense of justifiable use of force,

commonly called self defense.

¶11 The case was tried to a jury in Powell County in March of 1996. The undisputed evidence

was that the altercation between Sattler and Martinson which resulted in Martinson's death

occurred shortly before midnight on April 20, 1995, in Cell 1 of the Jail's Cell Block A and that

Sattler inflicted a minimum of six blows to Martinson's head [288 Mont. 87] and neck with a

metal bar which had affixed the seat to an exercise bicycle located in that cell.

¶12 Each of the four cells in Cell Block A contained bunks and a combination sink and toilet.

Cell 1 did not house any inmates, but was used as a common bathroom and exercise room by the

inmates. Cell 2 housed five inmates, including Sattler, Martinson, and two inmates who testified for

the State at trial. Cells 3 and 4 housed two and five inmates, respectively. The remainder of Cell

Block A was composed of a common area containing a main room and a shower. Except during

the period from approximately midnight to 6:00 a.m. each day, during which time the inmates were

locked in their cells, inmates frequently sat at two picnic tables in the main room and watched television, played cards and the like.

¶13 According to the evidence presented by the State, jailer Luc Mathias (Mathias) checked on the inmates in Cell Block A at around 11:20 p.m. on April 20, 1995, and saw that a few of them were watching television in the main room; everything was quiet and seemed normal. About 20 minutes later, Darlene Healy (Healy), a dispatcher whose responsibilities included monitoring a surveillance and intercom system at the Jail, noticed Sattler pacing back and forth in the main room of Cell Block A. She did not see any other inmates in the main room at that time. Approximately 15 minutes later, someone pressed the intercom button in Cell Block A. When Healy pressed the button which allowed her to communicate with the caller and asked what the caller needed, the response was "Man down." "Man down" was repeated. Healy advised Mathias of the message and called Lake County Deputy Sheriff David Alexander (Alexander). She continued to monitor the surveillance and intercom system; she did not see anything unusual, but thought she could hear someone trying to breathe.

¶14 Mathias went to the catwalk in front of the cell block, observed feet protruding from Cell 1, locked down all of the inmates and entered Cell Block A. He saw Martinson lying on his back in Cell 1. Martinson's head was under the bunk opposite the door to the cell; he was lying in a lot of

blood but was still alive. Mathias also noticed a bloody metal bar lying across the sink and the exercise bicycle. Mathias left the cell block and directed Healy to call an ambulance.

¶15 Alexander arrived, together with emergency personnel who also noticed that Martinson's head was approximately three to four inches under the bunk. Martinson was transported to the local hospital and died there less than an hour later. [288 Mont. 88]

¶16 Inmate Dale Tammen (Tammen) testified that a number of inmates, including himself and Sattler, were watching television at the picnic tables shortly before midnight on April 20, 1995. Martinson was there on and off. Tammen heard a "loud thump" from Cell 1, turned, and saw Martinson on the floor of Cell 1 slumped against the exercise bicycle with his legs facing back toward the bunks; Martinson appeared to be unconscious and Sattler was standing over him looking down. Tammen noticed a large wound in the back of Martinson's head, and possibly another next to it. He saw Sattler spin Martinson around and lay him flat on the floor.

¶17 Tammen went briefly to his own cell, Cell 2, and then followed the other inmates to Cell 4, the cell farthest away from Cell 1. He heard a series of approximately five or six more "thumps" in rapid succession over a three-to five-second period. Soon thereafter, Sattler came to Cell 4 and directed the inmates to go to their cells. Sattler returned to the main room and began pacing, then

went to Cell 2, laid down on his bunk and started reading a book. After borrowing a shirt from another inmate, Sattler took off his own shirt and wiped his feet with it. He then tore up his shirt and flushed it down the toilet; Tammen did not observe any injuries on Sattler when he changed shirts. After Sattler said it was okay to do so, Tammen pressed the intercom button and reported that there was a "man down." According to Tammen, Sattler asked if any of the inmates had seen anything and if anyone was going to betray him.

¶18 While not identical, the testimony of inmate Jonathan Nunn (Nunn) largely corroborated Tammen's version of the events at issue. He heard loud banging noises coming from Cell 1 which sounded to him like metal on metal. Similarly, inmate Leslie Butler (Butler) heard "thumping" noises while showering which sounded like "metal hitting metal." On returning to his cell, Butler suspected something was wrong because Sattler was alone in the main room of Cell Block A.

¶19 Inmate Jody Law (Law) testified that the seat had been on the exercise bicycle in Cell 1 approximately an hour before the incident in question and was still there shortly before the incident when he went into Cell 1 to use the toilet. Sattler came into Cell 1 while Law was there and remained in the cell when Law returned to the main room. Upon his return to the picnic tables, Law noticed that Sattler had left his glasses on the table; this was noteworthy, in Law's view,

because Sattler "just never took [his glasses] off." Law did not see anyone else go into Cell 1 after he left Sattler there but, "maybe a couple minutes" later, he heard a "scuffle going on behind" which

[288 Mont. 89] started with kind of a dull thumping sound and then started sounding "like taking a pipe and hitting it against metal ... or something." Law looked into Cell 1 momentarily and saw no one; he noticed only that the exercise bicycle moved a little bit. He then saw Sattler come out of Cell 1, wiping his hands off on his shirt. Sattler went to Cell 2, then came to Cell 4, where the other inmates were gathered, and said only "Has anybody got a problem with that?" Like other inmates, Law could hear someone gasping for breath in Cell 1 while Sattler returned to the main room to pace.

¶20 Inmates described Sattler as intimidating, unpredictable, temperamental and the "boss" of the cell block. He was bigger than the other inmates. Martinson, on the other hand, was described as a smaller, nonaggressive "happy go lucky kind of guy," who was quiet, wimpy, naive and a pest. Sattler apparently did not like Martinson very much and frequently would slap Martinson's bunk to frighten him.

¶21 According to inmate Shannon Swimmer (Swimmer), Sattler's attitude had undergone a change for the worse several weeks before Martinson's death when Sattler learned he would be

receiving a significant sentence on the attempted deliberate homicide offense which resulted in his placement at the Jail. Indeed, he and Sattler devised a plan to escape from the Jail and considered disassembling the exercise bicycle to use parts of it--including the metal bar to the seat--as weapons. They had gotten as far as removing the seat but had not removed the bar which held the seat--and which Sattler ultimately used to beat Martinson to death. Swimmer abandoned the escape plan upon receiving a lesser sentence than he had anticipated for his underlying offense.

¶22 On the morning of either April 19 or April 20, 1995, Swimmer was to be transported to the MSP. Before leaving he asked--and was permitted--to speak to Sattler. Swimmer testified that, during their conversation, Sattler indicated to Swimmer that somebody was going to die. Sattler pointed in the direction of Martinson or the other inmate sleeping on a top bunk in Cell 2. Swimmer could not tell whether Sattler was joking or serious but, in any event, he did not report the conversation to anyone at the Jail. He later told an investigator about the conversation, stating Sattler said he was going to "do" someone.

¶23 The State also presented evidence that there were no defensive-type wounds on Martinson and testimony--in addition to that of Tammen--that no signs of injury were observed on Sattler after the incident. Sattler did not claim to have been attacked or injured in the [288 Mont. 90] incident at the time. No identifiable fingerprints were found on the metal bar which inflicted the blows resulting in Martinson's death, but blood spatter evidence was consistent with the State's

theory that most of the blows Martinson received were inflicted after his head was low to the ground in Cell 1.

¶24 Sattler testified on his own behalf as the only witness for the defense. He did not deny having caused Martinson's death, but testified that he did so in self defense and not purposely. According to Sattler, he had been working out--during which he did not wear his eyeglasses--earlier in the evening of April 20, 1995, and then watched the David Letterman show on television with other inmates. When he entered Cell 1 to use the toilet, dropping his pants in preparation, he saw a person who turned out to be Martinson standing by the toilet. Sattler testified that Martinson swung at him with a weapon, that he went into a defensive posture, and that he was hit under the arm and on the left rib cage. He punched Martinson and they struggled over the metal bar Martinson had in his hands; Martinson went down on his knees and Sattler hit him again, but Martinson continued to come at him. According to Sattler, he had no intention of killing Martinson and did not think he had hit Martinson that hard; his only intent was to protect himself. Sattler's version of the incident was that he struck Martinson on the top of the head a couple of times, Martinson hit the lower bunk pretty hard when he fell against it, and then Martinson hit his head on the floor.

¶25 Sattler also testified that he was not the "boss" of the cell block, admitted that he had

slapped Martinson's bunk on occasion, but denied that he had any problem with Martinson. He denied having had a conversation with Swimmer about Martinson when Swimmer was leaving the Jail, expressly denied telling Swimmer that he was going to kill anyone and, indeed, denied ever having had a conversation with Swimmer which lasted as long as the conversation Swimmer described.

¶26 The State presented six rebuttal witnesses. A Jail inmate testified about Sattler's threats to inmates. In addition, the jailer who allowed Swimmer to talk to Sattler before being transported to the MSP testified that the conversation lasted about 11/2 minutes, and the employee who transported Sattler to the MSP approximately 12 hours after the incident testified that he saw no swelling or bruising on Sattler during a pretransport strip search. Pat Warnecke (Warnecke), the chief juvenile probation officer in Flathead County, testified that he had known Martinson for years through his work [288 Mont. 91] and otherwise and that, in his opinion, Martinson was not considered a violent or particularly aggressive individual. Finally, Martinson's widow testified that Martinson was nonviolent and that he would get upset and even cry if she got angry at him.

¶27 The jury found Sattler guilty of deliberate homicide and, thereafter, the State provided Sattler with formal notice of its intent to seek the death sentence. Following a sentencing hearing, the District Court entered its findings of fact, conclusions of law, judgment and sentence. The

STATE OF MONTANA,

court

found the existence of two statutory aggravating circumstances and no mitigating circumstances.

The District Court sentenced Sattler to death and set an execution date of July 10, 1996. Sattler

appealed and the sentence was stayed pending resolution of this appeal and automatic review.

DISCUSSION

¶28 1. Did the District Court abuse its discretion by limiting Sattler's questioning of prospective

jurors during voir dire?

¶29 During voir dire, Sattler's counsel inquired of individual prospective jurors whether they

thought someone in jail "would commit a homicide unless there was something that caused this to

happen[.]" When this question was asked of the third prospective juror, the State objected that the

question suggested the State had to prove motive. The District Court sustained the objection. We

review such rulings for abuse of discretion. Hill v. Turley (1985), 218 Mont. 511, 520, 710 P.2d

50, 56.

¶30 Sattler contends that he had a right to voir dire on his defense of justifiable use of force and

that the right was infringed by the District Court's refusal to allow him to inquire about whether

there must be a cause or reason to commit a homicide in jail. It is true that, where notice of a

defense is given, a refusal to allow the defendant to voir dire prospective jurors on the defense constitutes prejudicial error. See State v. McKenzie (1980), 186 Mont. 481, 501, 608 P.2d 428, 441 (citing State v. Olson (1971), 156 Mont. 339, 480 P.2d 822), cert. denied, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980). However, neither McKenzie nor Olson provides a basis for determining that the District Court abused its discretion in the present case.

¶31 In McKenzie, the trial court did not allow the defendant any voir dire regarding mental disease or defect and the defendant claimed prejudice on appeal. We concluded that the voir dire was properly prohibited because notice had not been given of reliance on [288 Mont. 92] the defense. McKenzie, 608 P.2d at 441. Here, notice of the defense was given and, therefore, McKenzie is not applicable.

¶32 In Olson, the defendant asserted an insanity defense and was denied the opportunity to voir dire on the subject. We determined that the defendant could not be assured of an impartial jury without questioning each prospective juror to see if he or she could understand and accept the insanity plea, and reversed the trial court. Olson, 480 P.2d at 825. Here, as in Olson, Sattler gave notice of the defense on which he intended to rely. Unlike in Olson, however, Sattler was permitted to voir dire on his defense of justifiable use of force. Indeed, he asked each prospective juror two questions directly related to the defense of justifiable use of force: first, whether a person

has a right to defend himself against someone attacking him with a weapon; and second, the extent

to which one could defend against an aggressor. These pointed questions regarding the defense

properly sought to ascertain whether prospective jurors could understand and accept the defense

at issue or, alternatively, whether they were biased against the defense from the outset.

¶33 The question disallowed by the District Court in the present case, however, did not relate

directly to Sattler's self defense theory. Instead, Sattler's question about whether a cause or reason

must exist to commit a homicide in jail suggested to prospective jurors that the State was required

to prove motive, and Sattler concedes that the State need not do so. On the face of it, the question

went beyond an attempt to determine whether potential jurors were biased against the justifiable

use of force defense.

¶34 We conclude that the District Court did not abuse its discretion in limiting Sattler's voir dire

of prospective jurors.

¶35 2. Did the District Court abuse its discretion by refusing to allow Sattler to inquire into the

reason the victim had been at the Pine Hills youth correctional facility?

¶36 As set forth above, Sattler testified that Martinson was the aggressor in the encounter.

Thereafter, the State called Warnecke, the chief juvenile probation officer in Flathead County, as a rebuttal witness. Warnecke knew Martinson through his work and otherwise. In his opinion, Martinson was not considered a violent or particularly aggressive individual.

¶37 Prior to beginning his cross-examination of Warnecke, Sattler's counsel asked for a bench conference at which he apparently sought permission to question Warnecke about Martinson having once been sent to the Pine Hills youth correctional facility (Pine Hills) [288 Mont. 93] for "molestation." Sattler's theory, apparently, was that "molestation" was a violent act and that evidence of Martinson's prior acts of violence became relevant after Sattler had identified Martinson as the aggressor in the incident. The bench conference was not recorded and Sattler did not pursue the line of inquiry thereafter. Sattler contends that the District Court prohibited his line of questioning and that the ruling constituted an abuse of discretion and prejudicial error.

¶38 The State asserts that we cannot review this issue absent both a record of the bench conference, which Sattler did not ensure was made, and an offer of proof as to the specific facts which would have been proven by the offered evidence. Sattler contends he was unaware the bench conference was not reported and directs our attention to the fact that, during the settling of instructions, he advised the District Court that he wanted to make a record of his effort to question Warnecke about Martinson being sent to Pine Hills for "molestation" and of his theory that the molestation was an admissible violent act by Martinson. The District Court acknowledged

Sattler's

earlier effort, agreed it had prohibited the questions in response to an objection by the State and

directed that "[t]he record will so reflect." According to Sattler, this record reflects the entirety of

the bench conference which occurred prior to his cross-examination of Warnecke. Taking Sattler

at his word, the record contains neither his specific legal argument for admissibility or the basis of

the State's objection and, as a result, it is deficient for purposes of appellate review.

¶39 Sattler asserts generally, however, that the offense for which Martinson was sent to Pine

Hills was a sexual offense in which Martinson caused bodily injury or used threats, intimidation or

force against the victim. As such, according to Sattler, Martinson's offense was a "crime of

violence" under § 46-18-104(2)(c), MCA, which constituted a specific instance of Martinson's

conduct admissible under Rule 405, M.R.Evid., as evidence identifying the aggressor in the

incident. Rather than leave this issue unresolved, almost certainly necessitating our addressing it in a

future collateral proceeding related to this death penalty case, we accept Sattler's fact-related

assertions about the nature of Martinson's earlier violent act as true for purposes of this opinion

only and address, on the merits, the arguments presented in Sattler's opening brief that the District

Court abused its discretion in precluding Sattler's line of inquiry to Warnecke. [288 Mont. 94]

¶40 Sattler relies first on two cases which predated the July 1, 1977, effective date of the

Montana Rules of Evidence State v. Jones (1914), 48 Mont. 505, 139 P. 441, and State v. Logan (1970), 156 Mont. 48, 473 P.2d 833--in arguing that evidence of the deceased's reputation for violence is admissible when the issue is self defense and there is doubt as to who was the aggressor. He is correct that the cases stand for the proposition cited, but they are of no assistance to him in this case for reasons in addition to the fact that they predated the Montana Rules of Evidence.

¶41 In Jones, the defendant was charged with first degree murder, admitted the homicide and asserted the defense of self defense. Jones, 139 P. at 443. On appeal, we addressed the issue of whether evidence that the decedent was reputed to be a turbulent, violent man was admissible for any purpose unless it was first shown to have been known to the defendant. We concluded that, when the issue is self defense and there is doubt as to who was the aggressor, evidence of the decedent's reputation for violence is admissible in order to enable the jury to resolve the doubt. Jones, 139 P. at 446-47 (citations omitted). We reiterated that rule of admissibility regarding reputation evidence in Logan many years later, clarifying that the reputation evidence was not admissible until a proper foundation had been laid via the defendant's testimony admitting the killing and raising the issue of the decedent being the aggressor. Logan, 473 P.2d at 841-42 (citations omitted).

¶42 As discussed, both Jones and Logan addressed the admissibility by the defendant of evidence regarding the decedent's reputation for violence. Neither addressed the issue before us in this case, namely, the admissibility of "specific instance" evidence regarding the victim's character by the defendant. Since Sattler was attempting to introduce the "molestation" incident by Martinson, rather than evidence regarding Martinson's reputation for violence, Jones and Logan do not support his position that the District Court erred in excluding the evidence.

¶43 With regard to current evidentiary rules, Sattler cites to Rule 404, M.R.Evid., in support of his argument that evidence of Martinson's character for violence was admissible. As a general rule, character evidence is not admissible to prove action in conformity therewith. Rule 404(a), M.R.Evid. There are exceptions to the general rule, however, and one of those exceptions applies to the case before us. Under Rule 404(a)(2), M.R.Evid., "[e]vidence of a pertinent trait of character of the victim of the crime" is admissible when offered by [288 Mont. 95] the accused. Thus, Sattler is correct that evidence of Martinson's character for violence was admissible in this case as a "pertinent" character trait vis-a-vis his justifiable use of force defense. That does not end the inquiry, however, because the question remains regarding the means by which Sattler was entitled to prove Martinson's character for violence.

¶44 Where character evidence is admissible pursuant to Rule 404, M.R.Evid., character or a

character trait can be proven through reputation evidence or specific instances of conduct evidence

as expressly authorized in Rule 405, M.R.Evid. Sattler argues summarily that Rule 405(b), M.R.Evid., authorized him to introduce the specific instance of Martinson's prior act of violence to

support his claim that Martinson was the aggressor in the altercation between the two men. Rule 405(b), M.R.Evid., permits proof of character via specific instances of conduct in two situations: 1) where character or a trait of character of a person is an essential element of a charge, claim or defense; and 2) where the character of the victim relates to the reasonableness of force used by the accused in self defense.

¶45 With regard to the first circumstance outlined in Rule 405(b), we must look to the justifiable use of force defense to determine whether Martinson's character for violence was an essential element of that defense. Pursuant to § 45-3-102, MCA, a person is justified in using force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself ... against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself. ...

Nothing in the statutorily-defined defense relates directly to the question of the identity of the aggressor and Sattler cites to no authority under which the identity of the aggressor is an "essential

element" of the justifiable use of force defense. His bare contention that Martinson's character for violence was an essential element of his justifiable use of force defense does not make it so. We conclude that the "specific instance" evidence regarding Martinson's prior violent act which Sattler sought to introduce through Warnecke was not admissible under the first circumstance set forth in Rule 405(b), M.R.Evid.

¶46 The second circumstance outlined in Rule 405(b), M.R.Evid., renders specific instances of the victim's conduct admis- [288 Mont. 96] sible where the victim's character regarding violence or aggression relates to the reasonableness of the force used by the accused in self defense. In this regard, we need observe only that this was not the purpose for which Sattler sought to introduce Martinson's prior act of violence. Indeed, as discussed above, Sattler sought to introduce the evidence to show that Martinson was the aggressor in the incident, not to support any claim that the force he used against Martinson was reasonable based on his knowledge of Martinson's history of violent acts. As a result, we conclude that the "specific instance" of Martinson's conduct which Sattler sought to introduce through Warnecke was not admissible under the second circumstance set forth in Rule 405(b), M.R.Evid.

¶47 Sattler raises two new arguments relating to this issue in his reply brief. Legal theories raised for the first time in an appellant's reply brief are outside the scope of such a brief and we do not

address them. See Rule 23(c), M.R.App.P.; Loney v. Milodragovich, Dale & Dye, P.C. (1995), 273 Mont. 506, 512, 905 P.2d 158, 162 (citation omitted). To do so would tilt the balance in a case in favor of the party who gets the final word in presenting its arguments to this Court.

¶48 Moreover, while we have addressed this issue absent an appropriate record in order to resolve it now rather than later, we did so on the basis that the arguments presented in Sattler's opening brief were those presented to the District Court during the trial of this case. Under the principles that guide all cases, a party may not change his theory on appeal from that advanced in the trial court. See State v. Fisch (1994), 266 Mont. 520, 524, 881 P.2d 626, 629; State v. Henderson (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016. Nor may a party raise an argument for the first time on appeal. Jones v. City of Billings (1996), 279 Mont. 341, 347, 927 P.2d 9, 13 (citations omitted). Notwithstanding that this is a death penalty case, we are neither required, nor inclined, to allow Sattler to re-create both the record and his arguments not once, but twice. We decline to address these newly raised arguments.

¶49 Finally, we observe that any error in the District Court's refusal to admit the evidence of Martinson's prior violent act under Rule 405, M.R.Evid., would not necessarily have resulted in prejudicial and reversible error. Reversible error is error which affects the substantial rights of a party. See § 46-20-701, MCA; Rule 103(a), M.R.Evid. Here, even if Sattler were entitled to prove Martinson's character for violence via the specific instance of conduct under Rule 405,

M.R.Evid., we conclude that exclusion of the evidence would [288 Mont. 97] not have affected Sattler's substantial rights in light of the other evidence of record. Thus, the record here does not establish prejudicial error and, under § 46-20-701(1), MCA, a reversal is not warranted.

¶50 First, while Martinson's act of "molestation" was relevant in that it had a tendency to make the existence of a disputed fact--whether, as Sattler testified, Martinson was the aggressor--more probable (see Rule 401, M.R.Evid.), the relevance was slight given the other evidence of record. It was clear from the circumstances of this case that Martinson was incarcerated in the Jail. In addition, the jury was aware that Martinson had been committed to Pine Hills during his youth and that he had been involved in an escape attempt when he was 14 or 15 years old. Furthermore, Warnecke testified that Martinson "could be" violent if armed with a weapon, as Sattler testified he was. Thus, whatever the specifics of the evidence of Martinson's act of "molestation," it would have been cumulative to other negative evidence about Martinson which was before the jury.

¶51 Moreover, whatever the nature of Martinson's "molestation" act, it had occurred approximately eight years before Martinson's death, by Sattler's counsel's own reckoning during oral argument, at a time when Martinson was in his mid-teen years. Therefore, the act was not only remote but potentially excludable on that basis. See State v. Benton (1992), 251 Mont. 401, 404,

825 P.2d 565, 567. Even if not excluded on remoteness grounds, the lapse of time between Martinson's "molestation" act and his death in 1995 rendered the probity of his act minimal at best.

¶52 We hold that the District Court did not abuse its discretion in refusing to allow Sattler to inquire into the reason the victim had been at Pine Hills.

¶53 3. Was there sufficient evidence to support the conviction?

¶54 The jury ultimately found Sattler guilty of deliberate homicide, which is defined in § 45-5-102(1)(a), MCA, as purposely or knowingly causing the death of another human being. In doing so, it implicitly rejected Sattler's defense of justifiable use of force.

¶55 As is true in every criminal case, the State was required to prove Sattler's guilt beyond a reasonable doubt. See § 46-16-204, MCA. Conversely, Sattler had the burden of producing sufficient evidence in support of his justifiable use of force defense to raise a reasonable doubt about his guilt. See State v. Daniels (1984), 210 Mont. 1, 16, 682 P.2d 173, 181. Like the elements of the charged offense, the elements of Sattler's defense--that is, that he was not [288 Mont. 98] the aggressor, that he reasonably believed he was in imminent danger of unlawful force and that he used only such force as was reasonably necessary to prevent his own death or serious

bodily harm (see § 45-3-102, MCA)--are factual in nature and are to be determined by the jury.

See State v. Arlington (1994), 265 Mont. 127, 140, 875 P.2d 307, 314 (citation omitted). It is

within the province of the finder of fact to weigh the evidence presented and determine the

credibility of witnesses; in the event of conflicting evidence on factual issues, the trier of fact

determines which will prevail. State v. Flack (1993), 260 Mont. 181, 189, 860 P.2d 89, 94

(citation omitted). Sattler argues that there was insufficient evidence to prove beyond a reasonable

doubt that he acted purposely and knowingly in causing Martinson's death in light of the evidence

he presented in support of his justifiable use of force defense.

¶56 This Court reviews the sufficiency of the evidence to sustain a guilty verdict in a criminal case

to determine whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the offense beyond a reasonable

doubt. State v. Richards (1995), 274 Mont. 180, 184, 906 P.2d 222, 224 (citations omitted).

Given our discussion above regarding the factual nature of the justifiable use of force defense and

Sattler's burden of producing enough evidence on the defense to raise a reasonable doubt, it is

clear that our sufficiency of the evidence standard remains unchanged where, as here, we are

reviewing a jury verdict which necessarily rejected the fact-based defense advanced. In other

words, the question of whether the defendant produced sufficient evidence regarding the

affirmative defense to raise a reasonable doubt as to his guilt is subsumed in the question of

whether, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

¶57 As set forth above, a person commits the offense of deliberate homicide if he or she purposely or knowingly causes the death of another human being. See § 45-5-102(1)(a), MCA. A person acts purposely with regard to a result or to conduct described by a statute defining an offense if it is the person's conscious object to engage in the conduct or cause the result. Section 45-2-101(63), MCA. A person acts knowingly with regard to a result when the person is aware that it is highly probable that the result will be caused by his or her conduct. Section 45-2-101(34), MCA. The purposely or knowingly mental state required to support a criminal conviction can be [288 Mont. 99] proved by direct evidence or inferred from circumstantial evidence such as the acts of the accused and the facts and circumstances surrounding the offense. See § 45-2-103(3), MCA; State v. Albrecht (1990), 242 Mont. 403, 413, 791 P.2d 760, 766.

¶58 On this record, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Sattler purposely and knowingly caused Martinson's death. Factually, it was undisputed that Sattler caused Martinson's death by inflicting blows to his head and neck area with a metal bar. Sattler admitted inflicting the blows which killed Martinson and the State's medical examiner testified that one of the blows actually indented--or caved in--Martinson's skull; the

beating also was sufficient to bruise the brain. Notwithstanding Sattler's testimony that he did not intend to kill Martinson, the nature of Martinson's fatal injuries--together with Sattler's awareness of his conduct and the jury's ability to infer that he also was aware that there was a high probability that that conduct would result in Martinson's death--was sufficient to support a finding that Sattler purposely or knowingly caused Martinson's death beyond a reasonable doubt. See Arlington, 875 P.2d at 319. Also supporting the jury's verdict that Sattler acted purposely or knowingly was the testimony from other inmates that Sattler had been annoyed with Martinson on numerous occasions, and Swimmer's testimony that Sattler stated his intention to kill either Martinson or another inmate within 18 to 42 hours before Martinson's death.

¶59 Sattler points to his denial that the conversation related by Swimmer took place. However, the jailer who permitted Swimmer to talk to Sattler prior to being transported to the MSP corroborated that a conversation between the two occurred. Sattler's related argument that Swimmer's testimony about the conversation was undermined by a conflict in the record about the timing of Swimmer's transport to the MSP goes to Swimmer's credibility, not to whether there was sufficient evidence regarding the requisite mental state to support Sattler's conviction. Moreover, it was the job of the finder of fact--that is, the jury--to weigh conflicts in the evidence and determine witnesses' credibility. See Flack, 860 P.2d at 94. We do not reweigh evidence or credibility here.

Indeed, in determining whether a rational trier of fact could have found the essential mental state element beyond a reasonable doubt, we review the evidence in the light most favorable to the prosecution. See Richards, 906 P.2d at 224.

¶60 Sattler's contention that the State did not present sufficient evidence of his mental state to enable the jury to find him guilty [288 Mont. 100] beyond a reasonable doubt of purposely or knowingly causing Martinson's death is not a model of clarity. He appears to argue that, because his testimony supported the existence of the elements of his justifiable use of force defense, the jury was obligated to find that a reasonable doubt existed regarding whether he had the requisite mental state for the deliberate homicide offense. As discussed above, however, the jury is free to weigh the evidence and determine the credibility of all witnesses in making its factual findings. We review the jury's verdict only to determine whether it is supported by sufficient evidence, not to determine whether there was evidence to support a different verdict.

¶61 Nor do Arlington and State v. Popescu (1989), 237 Mont. 493, 774 P.2d 395, on which Sattler relies, support his argument that, having presented evidence on all three elements of his defense, the jury had insufficient evidence before it to find that he acted purposely or knowingly and to convict him of deliberate homicide. In Arlington, we cited to Popescu for the three

elements

which must be proved in order to establish the affirmative defense of justifiable use of force. Arlington, 875 P.2d at 318 (citation omitted). In Popescu, the issue on appeal was whether the defendant had introduced sufficient evidence to warrant submitting the justifiable use of force defense to the jury. We held that he had, reversed the trial court's refusal to instruct the jury on the defense, and remanded for a new trial. Popescu, 774 P.2d at 396-97. That issue is not before us in the present case. Here, the District Court did instruct the jury on Sattler's justifiable use of force defense and the instruction reflected its determination that there was sufficient evidence to warrant submitting the defense to the jury. Neither Arlington nor Popescu stands for the proposition that evidence sufficient to warrant submitting the justifiable use of force defense to a jury raises a reasonable doubt as to a criminal defendant's guilt as a matter of law.

¶62 Finally, we observe that Sattler effectively conceded this issue in his reply brief on appeal. There, he stated that "it could not be said that the State had failed to prove it's [sic] case ...."

¶63 We conclude that, on this record, the jury could have found the essential elements of the charged deliberate homicide offense beyond a reasonable doubt. As a result, we hold that there was sufficient evidence to support Sattler's conviction.

¶64 4. Did the District Court commit reversible error in analyzing aggravating or mitigating

circumstances? [288 Mont. 101]

¶65 After the State served formal notice of its intent to seek the death penalty, the District Court held the sentencing hearing required by § 46-18-301, MCA, to determine the existence or nonexistence of aggravating circumstances as set forth in § 46-18-303, MCA, and mitigating circumstances as set forth in § 46-18-304, MCA. It found that two aggravating circumstances and no mitigating circumstances existed. Accordingly, the District Court sentenced Sattler to death.

¶66 Sattler challenges the District Court's determinations regarding both aggravating and mitigating circumstances. We consider his arguments in turn.

    a.   Aggravating circumstances

¶67 The District Court determined that two statutory aggravating circumstances existed: first, that the offense of which Sattler was convicted was deliberate homicide and it "was committed by a person serving a sentence of imprisonment in the state prison[,]" as set forth in § 46-18-303(1), MCA; and, second, that the offense was deliberate homicide and Sattler "had been previously convicted of another deliberate homicide[,]" as set forth in § 46-18-303(2), MCA. Sattler contends that the District Court's determination that the offense was committed by a person serving a sentence of imprisonment in the state prison is erroneous as a matter of law, relying on State v.

Keith (1988), 231 Mont. 214, 754 P.2d 474, and, as a result, that his death sentence should be vacated.

¶68 In Keith, the defendant pleaded guilty to six charged offenses, including aggravated kidnaping and deliberate homicide. Keith, 754 P.2d at 476-77. Keith was on parole from the state of Washington at the time of the offenses and, on that basis, the trial court ultimately determined that the § 46-18-303(1), MCA, aggravating circumstance existed. We reversed that determination on appeal, concluding that the statute expressly applied to a person serving "a sentence of imprisonment in the state prison" and that the plain language of the statute did not permit an interpretation which would include an individual on parole. Keith, 754 P.2d at 490.

¶69 Sattler contends that, because he was under sentence to the MSP at the time of Martinson's death but physically present in the Jail as the result of a different charge, Keith bars application of the § 46-18-303(1), MCA, aggravating circumstance requiring that a person be serving a sentence of imprisonment in the state prison. The State argues, in response, that Keith addressed only the parole situation presented therein and did not preclude application of the [288 Mont. 102] aggravating circumstance in situations such as that presently before us where a defendant is temporarily housed at a county detention facility while still under sentence to a term of imprisonment in the MSP. We need not resolve this dispute, however, because even if the District Court erred in finding that the aggravating circumstance set forth in § 46-18-303(1), MCA, exists

and we disregard that circumstance accordingly, the error is harmless in this case.

¶70 As set forth above, the District Court determined that two aggravating circumstances existed in this case. The first is the "serving a sentence of imprisonment in the state prison" circumstance discussed above. The second is that contained in § 46-18-303(2), MCA, and undisputed by Sattler: namely, that the deliberate homicide was committed by a defendant--Sattler--who previously had been convicted of another deliberate homicide. The court also concluded that "either [aggravating circumstance] is sufficient to support the sentence to be imposed."

¶71 In determining whether to impose a death sentence, a sentencing court in Montana must take into account the statutory aggravating and mitigating circumstances and "shall impose a sentence of

death if it finds one or more of the aggravating circumstances" and no mitigating circumstances sufficiently substantial to call for leniency. Section 46-18-305, MCA. Thus, the District Court in this case was statutorily required to sentence Sattler to death upon the finding of the single aggravating circumstance that he previously had been convicted of a deliberate homicide and the absence of mitigating circumstances sufficient to call for leniency.

¶72 Nor, under a statutory death penalty scheme like Montana's, must a death sentence be reversed or a new sentencing hearing conducted if one of several aggravating circumstances found

to exist is subsequently held to be inapplicable. See Zant v. Stephens (1983), 462 U.S. 862, 873-80, 103 S.Ct. 2733, 2741-44, 77 L.Ed.2d 235, 247-52. Sattler does not contend otherwise. Indeed, he concedes that the death penalty still may be imposed under Zant so long as this Court ensures that the inapplicability of one aggravating circumstance does not render the death penalty arbitrary or capricious. Sattler goes on to argue that this death penalty is arbitrary or capricious, and we address his arguments in that regard in issue five below as part of our automatic review of the death sentence pursuant to §§ 46-18-307 through 46-18-310, MCA.

¶73 As noted above, the District Court concluded that the existence of either one of the aggravating circumstances was sufficient to [288 Mont. 103] support the death sentence in this case. That conclusion is correct under § 46-18-305, MCA, and, as a result, any error in the court's determination that the § 46-18-303(1), MCA, aggravating circumstance exists in this case would not affect Sattler's substantial rights or prejudice him. See § 46-20-701, MCA. Therefore, we hold that the District Court did not commit reversible error in analyzing the aggravating circumstances.

b. Mitigating circumstances

¶74 The District Court made extensive findings with regard to both the mitigating circumstances enumerated in § 46-18-304(1), MCA, and the "catchall" mitigating circumstances set forth in § 46-18-304(2), MCA. Indeed, its findings addressed each of the mitigating circumstances

enumerated in the statute meticulously and methodically, set forth any evidence of record relating to

each, and found whether or not the mitigating circumstance existed. Sattler advances a number of

assertions of error relating to the District Court's analysis of the mitigating circumstances.

¶75 Sattler's first contention is that the District Court erred in considering every enumerated

mitigating factor rather than only those he raised and relied on as mitigating circumstances. He cites

to no authority in support of this assertion of error and it is clear that § 46-18-306, MCA, requires

a court imposing a death sentence to make "specific written findings of fact as to the existence or

nonexistence of each of the circumstances set forth in ... 46-18-304." See also State v. Smith

(1996), 280 Mont. 158, 167, 931 P.2d 1272, 1277, cert. denied 118 S.Ct. 410, 139 L.Ed.2d

314 (1997). We conclude that the District Court did not err in considering each of the mitigating

circumstances enumerated in § 46-18-304(1), MCA.

¶76 Sattler also contends that the District Court improperly considered the lack of mitigating

circumstances as justification for imposing the death sentence, contrary to § 46-18-305, MCA.

This contention is entirely without merit. As discussed above, § 46-18-305, MCA, requires the

imposition of a death sentence if one or more aggravating circumstances exist and there are no

mitigating circumstances sufficiently substantial to call for leniency. In reaching that ultimate

sentencing issue in this case, the District Court carefully performed the analysis of mitigating

circumstances required by § 46-18-304, MCA, and found that no mitigating circumstances existed. Nothing in the court's findings, conclusions, judgment and sentence supports the interpretation urged by Sattler. [288 Mont. 104]

¶77 Next, Sattler asserts that the District Court erred in failing to find the existence of the mitigating circumstance contained in § 46-18-304(1)(e), MCA, namely, that "[t]he victim was a participant in the defendant's conduct or consented to the act." The court found that there was no evidence that Martinson was a participant in Sattler's conduct or consented to the act of being beaten to death by him. The court also found that "[t]he jury did not accept defendant's claim of self defense and neither does the Court."

¶78 Sattler's argument seems to be that, notwithstanding the jury's rejection of his self defense theory, the court was required to consider his testimony that Martinson was the aggressor as mitigating evidence under § 46-18-304(1)(e), MCA, that Martinson participated in or consented to Sattler's acts which resulted in his death, and to make findings in his favor thereunder in sentencing. We observe at that outset that, as a matter of logic, Sattler's argument is flawed because it mixes apples and oranges. The mitigating circumstance set forth in § 46-18-304(1)(e), MCA--that Martinson participated in or consented to Sattler's act--would not exist even assuming arguendo the truth of Sattler's testimony that Martinson was the aggressor. The reason is that, even

under Sattler's theory, Martinson's acts were his own, as were Sattler's. In other words, that Martinson's acts may have produced Sattler's responsive acts--in Sattler's version of the events at issue--does not make Martinson a participant in or a consenter to Sattler's acts of beating him to death. Therefore, Sattler's self defense-related testimony that Martinson was the aggressor simply did not constitute evidence of the mitigating circumstance set forth in § 46-18-304(1)(e), MCA. As a result, the District Court was not obligated to consider it or to make findings relating thereto.

¶79 Nor is Sattler's reliance on State v. Korell (1984), 213 Mont. 316, 690 P.2d 992, as legal support for this argument well placed. In Korell, the defendant was charged with attempted deliberate homicide and aggravated assault and gave notice of his intent to rely on a "mental disease or defect" defense to prove that he did not have the mental state required as an essential element of the offenses charged. Korell, 690 P.2d at 995. The jury found Korell guilty of both charged offenses and, on appeal, Korell argued that the trial court erred in not considering his mental condition at sentencing, as required by law, by stating that it would not revisit the jury's rejection of the defense. Korell, 690 P.2d at 996, 1004. [288 Mont. 105]

¶80 We observed that the applicable sentencing statutes expressly required the sentencing court to consider whether the defendant suffered from a "mental disease or defect," even where the jury had convicted the defendant. Indeed, the court could sentence the defendant to imprisonment only after specifically finding that the defendant did not suffer from such a disease at the time of the

offense. Korell, 690 P.2d at 1000. In light of the statutes imposing an affirmative obligation on the sentencing court to independently evaluate the defendant's mental condition, the court's refusal to do so was erroneous and required that the sentence imposed be vacated and the case remanded for resentencing. Korell, 690 P.2d at 1004.

¶81 Korell is inapplicable here. There, statutes expressly required the sentencing judge to independently determine whether the defendant suffered from a mental disease or defect even after the jury had rejected the mental disease or defect defense. No similar statutes required the District Court in this case to independently evaluate Sattler's self defense evidence after it had been rejected by the jury. Unlike the situation in Korell, the language setting forth the statutory mitigating circumstance relating to a victim participating in or consenting to a defendant's acts is not similar, much less identical, to the language defining the justifiable use of force defense.

¶82 We conclude, therefore, that the District Court did not err in failing to make independent factual findings in Sattler's favor--or at all--on the evidence Sattler presented on his justifiable use of force defense. We further conclude that the District Court did not err in failing to find that Sattler had established the mitigating circumstance set forth in § 46-18-304(1)(e), MCA.

¶83 Sattler's next argument is that the District Court did not properly consider the "catchall" mitigating evidence he presented under § 46-18-304(2), MCA. The first purported mitigating evidence is that Sattler was kept at the Jail, rather than returned to the MSP, following his arrest for attempted deliberate homicide at Swan River; according to Sattler, this evidence reflected that he was not considered a danger to other inmates. Contrary to Sattler's contentions, however, the District Court did consider that evidence, observing that persons accused of committing felonies within Lake County ordinarily are placed in the Jail to await the disposition of their cases. The court found that this evidence did not establish a mitigating circumstance under § 46-18-304(2), MCA, and we agree.

¶84 Sattler also argues that the District Court committed two distinct errors with regard to its finding "[t]hat the sentences [288 Mont. 106] imposed following the prison riot trials, referred to by [Sattler], do not constitute a mitigating circumstance as applied to this defendant and this offense." Sattler first asserts that he referenced those sentences in relation to his "excessive or disproportionate" arguments under § 46-18-310(3), MCA, rather than as mitigating evidence. That may be so. Moreover, proportionality evidence is not properly considered by a sentencing court as a mitigating factor in performing the individualized sentencing required by §§ 46-18-303 and 46-18-304, MCA. Smith, 931 P.2d at 1282. Rather, it is within the province of this Court, with its statewide perspective, to conduct a proportionality review on automatic review of a death sentence "to prevent imposition of the death penalty in a wanton and arbitrary fashion." Smith,

¶85 Here, Sattler referred to proportionality during the sentencing hearing and the District Court

merely found that sentences in other cases did not constitute a mitigating circumstance with regard

to Sattler and the deliberate homicide at issue. This determination is not at odds with our holding in

Smith and it was, at most, an indication of the sentencing court's caution and thoroughness in

attempting to address all of Sattler's arguments and evidence in the findings on mitigating

circumstances.

¶86 Sattler's second assertion of error relating to his reference to the prison riot cases, vis-a-vis

his disproportionality argument, is that the District Court failed to address whether the death

sentence in this case was excessive or disproportionate to the penalties imposed after the riot trials.

He cites no authority under which the District Court was required to do so, however, and, as

discussed above, Montana statutes and case law reserve the proportionality review to this Court.

Sections 46-18-307 and 46-18-310, MCA; Smith, 931 P.2d at 1282.

¶87 Next, Sattler argues that the District Court did not consider either (1) the psychological

report he presented, (2) that he came from dysfunctional family circumstances, as outlined in the presence report, or (3) that the State was unwilling to negotiate away the death penalty as mitigating circumstances under § 46-18-304(2), MCA. It is clear that the court did consider the psychological report, as established by its finding that "said report has been fully considered by the

Court." Sattler advances no authority under which the fact that the sentencing court considered the report in relation to the mitigating circumstance set forth in § 46-18-304(1)(d), MCA, [288 Mont. 107] rather than as a mitigating circumstance under § 46-18-304(2), MCA, constitutes legal error.

¶88 Moreover, while the District Court's findings on mitigating circumstances did not expressly reference either the family information contained in the presentence report or Sattler's evidence of the State's unwillingness to enter into a plea bargain that excluded the death penalty, the court indicated that it had considered all of the evidence and all of the circumstances of the defendant, including his character and propensities. The law does not require the sentencing court to make findings on each piece of purportedly mitigating evidence produced. See Smith, 931 P.2d at 1282-83. The law requires only that the court consider all such evidence and we must assume that it did so, particularly where--as here--the court so states. See Parker v. Dugger (1991), 498 U.S. 308, 314-15, 111 S.Ct. 731, 736, 112 L.Ed.2d 812, 822; Jeffries v. Blodgett (9th Cir. 1993), 5 F.3d 1180, 1197.

¶89 We conclude that the District Court did not err in analyzing mitigating circumstances.

¶90 5. Was the death sentence imposed under the influence of passion, prejudice or any other arbitrary factor?

¶91 This Court automatically reviews every death sentence imposed under Montana law. Section 46-18-307, MCA. In doing so, we determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor[.]" Section 46-18-310(1), MCA. Our review, conducted from a statewide perspective rather than from the individualized perspective the sentencing court must apply, serves as a check against arbitrary imposition of the death penalty. See Smith, 931 P.2d at 1282; State v. Langford (1991), 248 Mont. 420, 436, 813 P.2d 936, 948 (citing Gregg v. Georgia (1976), 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859, 893).

¶92 Here, Sattler asserts that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factors because the District Court imposed the sentence on the same day the sentencing hearing was held and because the sentence was based on Sattler's lack of rehabilitation. Indeed, Sattler urges that the District Court improperly converted the lack of rehabilitation into an aggravating circumstance. We have reviewed the record and conclude that it does not indicate that the death penalty was imposed under any arbitrary influence. [288 Mont.

¶93 With regard to the promptness of the District Court's written findings, conclusions, judgment and sentence, the sentencing hearing in this case lasted only 1 1/2 hours and the evidence presented was neither extensive nor complex. The District Court recessed the hearing and indicated that it had drafted findings and conclusions to fit both a life sentence and the death sentence and would give its predrafted findings and conclusions full consideration, along with "the material that was introduced [at the sentencing hearing] and the court file and my notes." Two hours later, the court reconvened and read its findings, conclusions, sentence and judgment in open court in Sattler's presence. As discussed above, the District Court's findings on aggravating and mitigating circumstances were thorough and detailed; further, they reflected that the court took the evidence before it into account in determining to impose the death penalty.

¶94 Sattler also contends that the District Court improperly used his lack of rehabilitation as the basis for imposing the death sentence and, indeed, converted that lack of rehabilitation into an aggravating circumstance. The record does not support this contention. First, the court's findings and conclusions were confined to addressing the aggravating and mitigating circumstances set forth in §§ 46-18-303 and 46-18-304, MCA. On the basis of those findings and conclusions, the

District Court entered its judgment and sentence imposing the death sentence on Sattler. In a later portion of the judgment and sentence, the court correctly quoted the correctional policy of this State as being "to protect society by preventing crime through punishment and rehabilitation of the convicted" (see § 46-18-101, MCA) and observed that, by his own conduct, Sattler had not taken advantage of the opportunities for rehabilitation provided via his prison term for the 1987 deliberate homicide. No legal or factual error exists in that portion of the judgment and, while a discussion of Montana's correctional policy may not have been required, it certainly was not prohibited. That discussion does not support Sattler's contentions that the death sentence was imposed because of his lack of rehabilitation and that the court improperly converted the lack of rehabilitation to an aggravating circumstance.

¶95 We conclude, on the record before us, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

¶96 6. Is the death sentence imposed disproportionate to the penalty imposed in similar cases?

[288 Mont. 109]

¶97 As noted above, this Court is required to determine whether the sentence of death imposed in a given case is "excessive or disproportionate to the penalty imposed in similar cases,

considering both the crime and the defendant." Section 46-18-310(3), MCA. In performing the proportionality review, we must reference the similar cases we considered. Section 46-18-310(3), MCA. Moreover, we examine only cases where the death penalty was--or could have been--imposed after conviction and which were appealed. See State v. Coleman (1979), 185 Mont. 299, 333-34, 605 P.2d 1000, 1020, cert. denied, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980), sentence vacated, 874 F.2d 1280 (9th Cir. 1989); Smith, 931 P.2d at 1285. In this regard, we review "the gravity of the offense, the brutality with which it was committed, and the factors, if any, which led to a call for leniency ...." State v. Turner (1993), 262 Mont. 39, 59, 864 P.2d 235, 247 (citation omitted), cert. denied, 513 U.S. 827, 115 S.Ct. 96, 130 L.Ed.2d 46 (1994).

¶98 We observe that Sattler initially urged us to overrule the Smith limitation vis-a-vis considering only cases where the death penalty was, or could have been, imposed after conviction, and to take into account the so-called prison riot cases in which inmates at the MSP committed deliberate homicides but the death penalty was not sought or imposed. He withdrew that request at oral argument, however, noting that the 1997 Legislature amended § 46-18-310, MCA, to essentially incorporate the scope of proportionality review we set forth in Smith. See 1997 Mont. Laws, Ch. 302, Sec. 1.

¶99 With the proper scope of our proportionality review in mind, therefore, we must examine the

proportionality of the death sentence in this case as compared with other cases appealed to us in which a deliberate homicide was committed by an incarcerated defendant and the death penalty was sought or imposed. It is undisputed that only two such cases exist and, because they arose from the same circumstances, we consider them together.

¶100 Douglas Turner and William Gollehon were charged with, and convicted of, deliberate homicide by accountability based on their having beaten Gerald Pileggi to death with a baseball bat while all three were incarcerated at the MSP. Turner, 864 P.2d at 237; State v. Gollehon (1993), 262 Mont. 1, 8-9, 864 P.2d 249, 254, cert. denied, 513 U.S. 827, 115 S.Ct. 95, 130 L.Ed.2d 45 (1994). The testimony at trial indicated that Pileggi died of multiple injuries to the head and trunk resulting from at least four blows, including one which was sufficient to cave in his skull. Turner, 864 P.2d at 238; Gollehon, 864 P.2d at [288 Mont. 110] 252-53. An inmate testified that Gollehon "had indicated that he was going to `mess [Pileggi] up.' " The same inmate saw Gollehon start the fight with Pileggi in the exercise yard, watched the two struggle for control of the bat and then saw Turner arrive and join Gollehon in continuing to beat Pileggi after he fell to the ground. Gollehon, 864 P.2d at 253; Turner, 864 P.2d at 238.

¶101 The trial court sentenced both Turner and Gollehon to death. Regarding Turner, the court found the existence of two aggravating circumstances, namely, that Turner was serving a term of

imprisonment at the MSP when he committed the offense and that he previously had been

convicted of a deliberate homicide. It also found that Turner's difficult childhood was insufficient to

call for lenity under the circumstances. Turner, 864 P.2d at 246. With regard to Gollehon, the

sentencing court found the existence of the same two aggravating factors and considered mitigating

evidence of the inhuman and traumatic childhood to which he had been subjected, but determined

that he had not taken advantage of available help in dealing with problems resulting from his

childhood. Thus, the court ultimately determined that the family history evidence was not sufficient

to preclude the death penalty. Gollehon, 864 P.2d at 260, 262-63.

¶102 The gravity and brutality involved in Sattler's beating death of Martinson are substantially

similar to the gravity and brutality of the offense committed by Turner and Gollehon. Here, as

there, an inmate was attacked with a weapon and beaten to death by blows to the head and other

areas of the body. Here, as there, at least one blow was sufficient to cave in the skull. Here, as

there, the beating continued after the victim was down. Here, as in Gollehon's case, there was an

indication in advance that the attack was going to be made.

¶103 Furthermore, Sattler--like Turner and Gollehon--had previously been convicted of a

deliberate homicide and, while we have not resolved whether the second aggravating

circumstance

which existed in Turner's and Gollehon's cases applies here, it is clear that all three men were incarcerated at the time they committed their deliberate homicides. Finally, the evidence of mitigation on which Sattler premised his call for lenity was no stronger than that presented by Turner and less persuasive than that presented by Gollehon.

¶104 Sattler's arguments that imposition of the death penalty in this case would be disproportionate to the death penalties imposed in Turner and Gollehon generally are based on his version of the facts rather than the version accepted by the jury. He also argues differ- [288 Mont. 111] ences in the facts relating to the two offenses, such as that two persons were involved in the beating death of Pileggi, who was smaller than either of them. He does not explain, and we certainly cannot conceive, how the fact that Sattler--the "boss" of Cell Block A--acted alone in beating Martinson--a smaller, wimpy guy--to death renders the death penalty here disproportionate to those imposed in Turner and Gollehon.

¶105 Sattler also points to the fact that Pileggi was beaten to death in front of eyewitnesses, while Martinson was not. From this, he posits that the evidence against him was speculative and circumstantial. Again, this argument essentially relates to the jury's weighing of the evidence in convicting him of the deliberate homicide, rather than to the proportionality of the death penalty in

this case. Having concluded above that sufficient evidence exists to support the conviction, we need not further address these types of arguments.

¶106 Sattler also seems to argue that, absent the existence of both of the aggravating circumstances found in Turner and Gollehon, the death penalty is disproportionate here as a matter of law. He cites to no authority, however, in support of the proposition that disproportionality exists between death penalties when the number of aggravating circumstances in factually similar cases is not equal. Nor is that a matter within the scope of our proportionality review under § 46-18-310, MCA, Smith and Turner.

¶107 Finally, Sattler contends that, unlike Turner and Gollehon, he accepted responsibility for his acts and, as a result, the death penalty is disproportionate here. Without regard to whether a defendant's acceptance of responsibility for the offense at issue is a proper consideration in our proportionality review, we reject Sattler's premise. While it is true that Sattler admitted killing Martinson, he has continued to assert that he had a right to do so because he was defending himself. We do not equate continuing to assert a justifiable use of force defense--even after the jury has rejected it--with "accepting responsibility" for a brutal deliberate homicide. Thus, we need not consider this contention further.

¶108 Having considered the offense and the defendant in the present case in proportion to the offenses and defendants in other Montana cases, we conclude that the death sentence imposed in this case is not excessive or disproportionate to the penalty imposed in similar cases.

¶109 7. Are the District Court's findings regarding the existence of the aggravating circumstance set forth in § 46-18-303(2), [288 Mont. 112] MCA, and the nonexistence of any mitigating circumstances supported by the evidence?

¶110 Our automatic review of death sentences includes, in addition to the "arbitrary factor" and proportionality issues discussed above, whether the evidence supports the sentencing court's findings regarding aggravating and mitigating circumstances. See § 46-18-310(2), MCA. This issue is separate and apart from the arguments relating to aggravating and mitigating circumstances

which Sattler raised--and we resolved--in issue four above.

¶111 The District Court made a number of underlying factual findings relating to its ultimate finding that the aggravating circumstance contained in § 46-18-303(1), MCA--namely, that the deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison--exists. The underlying findings are not only supported by the evidence, they are undisputed. As discussed above, we need not resolve here whether the court's ultimate

determination regarding this aggravating circumstance is correct because, even if incorrect, it was harmless. Nor need we address at length whether the evidence supports the District Court's ultimate determination that the aggravating circumstance set forth in § 46-18-303(2), MCA--that the deliberate homicide was committed by a person previously convicted of a deliberate homicide--exists. It does and, indeed, this also is undisputed. Furthermore, the evidence supports the court's findings regarding the nonexistence of other aggravating circumstances set forth in § 46-18-303, MCA.

¶112 With regard to whether the evidence supports the District Court's findings on the existence or nonexistence of the mitigating circumstances enumerated in § 46-18-304, MCA, we conclude that it does. The only enumerated mitigating circumstance on which Sattler offered evidence or argument was the "participating in or consenting to" the homicide argument under § 46-18-304(1)(e), MCA. As discussed above, Sattler's self defense testimony did not establish this mitigating circumstance as a matter of fact, logic or law. Thus, the evidence supported the District Court's finding that this mitigating circumstance did not exist.

¶113 Sattler's other evidence in mitigation was advanced under the "catchall" provision contained in § 46-18-304(2), MCA, and consisted of his family background, a 1984 psychological evaluation, and the fact that he was housed in the Jail, rather than returned to the MSP, upon being charged with attempted deliberate homicide while at Swan River. However, the mere introduction

of evidence [288 Mont. 113] regarding mitigating circumstances does not require a finding that the

mitigating circumstance to which the evidence relates exists.

¶114 We conclude that the District Court's findings regarding the existence of the aggravating

circumstance set forth in § 46-18-303(2), MCA, and the nonexistence of any mitigating

circumstances are supported by the evidence.

¶115 Affirmed.

CHIEF JUSTICE TURNAGE, JUSTICES NELSON and REGNIER concur.

JUSTICE LEAPHART, specially concurring.

¶116 I concur with the result reached by the Court and I would affirm the judgment of the

District Court. However, for the reasons set forth in my special concurrence in State v. Smith

(1996), 280 Mont. 158, 186, 931 P.2d 1272, 1289, I do not agree with the limits that this Court

and the legislature have placed upon the scope of our proportionality review. Section 46-18-310,

MCA (1997). Nonetheless, whether reviewed under § 46-18-310, MCA (1997), or under the

more expansive standard that I have suggested, I agree that the sentence imposed on Sattler was

not out of proportion to other similar cases, specifically the Turner and Gollehon cases cited in the

opinion.

JUSTICE TRIEWEILER specially concurring.

¶117 I concur with the result of the majority opinion. I would affirm the judgment of the District Court. I do not agree with all that is said therein, however, and in particular, disagree with parts of the majority's rationale for affirming the District Court's exclusion of the victim's prior criminal offense.

¶118 The majority first sets forth § 45-3-102, MCA, which pertains to self-defense, and then concludes that the statute has nothing to do with which of two individuals was the aggressor. I would conclude that the statute is all about who was the aggressor. Self-defense is, by definition, a reaction to an act of aggression. The fact that the term "aggressor" is not used in § 45-3-102, MCA, should not foreclose the obvious.

¶119 I would affirm the District Court's exclusion of evidence regarding Martinson's prior offense (whatever that offense was) on the basis that no adequate offer of proof was made to preserve the issue for appeal. Rule 103(a)(2), M.R.Evid., provides as follows:

(a) ... Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and [288 Mont. 114]

....

(2) ... In case the ruling is one excluding evidence, the substance of the evidence

was made known to the court by offer or was apparent from the context within which questions were asked.

¶120 In this case, we, as the reviewing court, do not know the substance of the evidence Sattler sought to introduce. During the cross-examination of the juvenile probation officer during which Sattler sought to introduce evidence of Martinson's prior offense, his discussion with the District Court occurred in a manner that could not be heard by the jury and was not recorded. The only record we do have are comments made after the conclusion of evidence and during the settlement of jury instructions. At that time, the following discussion was had:

[MARTINSON'S ATTORNEY]: Your Honor, while we're waiting, one other thing I think we need to put on the record would be the conversation we had in terms of when Mr. Warnecke was testifying, about my wanting to get in of Mr. Martinson being sent to Pine Hills for molestation because I believe that was a violent act. And the State objected and the Court indicated that it would not allow me to ask those questions.

THE COURT: With respect to the molestation charge, that's correct.

[MARTINSON'S ATTORNEY]: Right.

THE COURT: The record will so reflect.

¶121 There is no offense in Montana known as "molestation," and the specific acts by Martinson

which Sattler sought to introduce were not identified. Therefore, I conclude that an adequate offer of proof was not made and that there is an insufficient record on which to conclude that relevant evidence pertaining to a characteristic of violence was excluded by the District Court.

¶122 For these reasons, I would affirm the judgment of the District Court, even though I do not agree with all that is said in the majority opinion.

JUSTICE HUNT specially concurs.

¶123 I concur in the result of the majority opinion and join Justice Terry N. Trieweiler and Justice W. William Leaphart in their concurring opinions.