

DA 06-0610

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 380

JOSEPH LESTER DESCHON,

      Petitioner and Appellant,

  v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC-1999-233
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad M. Wright, Hooks & Wright, P.C., Helena, Montana

      For Appellee:

          Hon. Mike McGrath, Montana Attorney General; C. Mark Fowler, Assistant
Attorney General, Helena, Montana

          Leo Gallagher, Lewis and Clark County Attorney; Michael Menahan, Deputy
County Attorney, Helena, Montana

Submitted on Briefs: November 8, 2007

Decided: November 18, 2008

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1    Joseph DeSchon was convicted of deliberate homicide for stabbing his nephew James "Jimmy J" Azure. Lewis and Clark County public defenders Randi Hood and Jeremy Gersovitz represented DeSchon. After sentencing, DeSchon filed a petition for post-conviction relief on the grounds that his counsel were ineffective. After an evidentiary hearing the petition was denied by the District Court. DeSchon appeals.

¶2    DeSchon raises two issues on appeal, which we restate as follows:

¶3    Issue 1:   Did the District Court err in denying post-conviction relief based on ineffective assistance of counsel because trial counsel did not adequately investigate and present evidence of the victim's propensity for violence?

¶4    Issue 2: Did the District Court err in denying post-conviction relief because DeSchon's counsel did not attempt to rehabilitate the witness Lawrence with a prior consistent statement?

## BACKGROUND

¶5    DeSchon was charged with deliberate homicide for the stabbing and killing of his nephew, Azure. On November 6, 1999, Azure and DeSchon first went to Phil Larragoite's home where they consumed alcohol and argued. They later went to DeSchon's apartment and began arguing again. The argument escalated and Azure struck DeSchon. Then, DeSchon grabbed a knife and stabbed Azure. The knife wounds inflicted by DeSchon resulted in Azure's death.

¶6    DeSchon gave a voluntary statement to the police saying he instinctively "grabbed what was there" in order to defend himself.

¶7     In DeSchon's first meeting with Hood after being charged, he informed her that Azure had come to Helena to stay with him and that on November 6th, Azure was looking for a fight.   DeSchon said he tried to kick Azure out of his house but he would not leave.  It was this argument that lead to the fight which resulted in Azure's death.

¶8     Prior to trial, DeSchon told Gersovitz he was scared of Azure because of Azure's size, because Azure had beaten up his girlfriend, Cheryl Gouge, and because Azure was acting violently on the day of the stabbing.  The defense filed a notice that DeSchon might present a justifiable use of force defense.

¶9     The State moved *in limine* to suppress evidence of Azure's bad character, his criminal record, his previous assaults on members of the DeSchon family, items Azure had stolen from the DeSchon family, and Azure's potential drug use on November 6th, the day of his death.  The defense did not object to the motion relating to stolen items.  Hood asserted it was her understanding she could inquire into Azure's violent acts or assaultive behavior that DeSchon was aware of at the time of the stabbing.  The court ruled that if Hood was to inquire into specific acts of bad character, she must comply with M. R. Evid. 405 and lay a proper foundation.

¶10    At trial, Hood and Gersovitz focused the defense on the events of November 6th to support the justifiable use of force defense.  They presented evidence of Azure's violent behavior on the night in question, DeSchon and Azure's argument, and the subsequent stabbing.  Also, in support of the self defense theory, testimony was elicited from a police officer that DeSchon's face was lacerated and that DeSchon told him Azure struck first by punching him twice which caused his head to hit the kitchen counter in the apartment.  An

3

emergency room physician stated DeSchon's injury could have been caused by striking a kitchen counter. Detective Russ Whitcomb testified DeSchon told him it was difficult to get Azure to leave, that he was afraid of Azure because he was bigger, and he was aware that Azure had put his girlfriend Gouge in the hospital. In addition, Larragoite testified to Azure's increasing intoxication the day of the stabbing, that Azure became increasingly tense toward DeSchon, and that Azure said he might have to beat DeSchon up. One of Larragoite's friends who was at the apartment testified Azure became aggressive toward DeSchon. Finally, two of DeSchon's neighbors testified they heard DeSchon arguing with Azure about leaving the apartment. One neighbor testified as to Azure's intimidating size.

¶11 In addition to presenting evidence from the day of the stabbing, the defense also presented testimony describing Azure's violence toward his girlfriend, Gouge. In her cross-examination of Gouge, Hood elicited testimony that Azure beat Gouge.

¶12 Defense counsel also called William Lawrence to testify in support of the justifiable use of force defense. Lawrence testified he met an intoxicated Azure at a bar the evening of November 6th and Azure told him he had just finished beating up DeSchon. Azure also showed Lawrence his bloody knuckles. On cross-examination, the State attempted to impeach Lawrence with a conflicting statement he had given to Detective Whitcomb to the effect that he met Azure at his apartment instead of at a bar. Lawrence denied making the statement and said Detective Whitcomb must have "made a mistake." On redirect, defense counsel questioned Lawrence about Azure's statements when he left the bar. Lawrence said Azure told him he was going to pick up Gouge at DeSchon's house and beat DeSchon up

4

again. In rebuttal, the State called Detective Whitcomb who reiterated his initial testimony regarding Lawrence's inconsistent statement.

¶13 Prior to trial, an investigator for the defense, Tom Manghan, met with Lawrence. Lawrence provided Manghan with a statement in which he said he met Azure at a bar and not at his apartment building. This statement to Manghan could qualify as a prior consistent statement under M. R. Evid. 801(d)(1)(B). Neither Gersovitz nor Hood called Manghan to testify to this prior consistent statement. At the hearing on the petition for post-conviction relief, Gersovitz testified he decided not to elicit testimony from Manghan concerning Lawrence's prior consistent statement because both he and Hood believed Lawrence was a credible witness and the State's cross-examination did not challenge the central points of Lawrence's testimony—that Azure was intoxicated, he claimed to have beaten DeSchon, and said that he would do it again.

¶14 On March 16, 2006, the District Court held a hearing on DeSchon's petition for post-conviction relief. DeSchon argued his trial counsel was ineffective because they failed to investigate and present evidence of Azure's violent character and consequently failed to effectively develop the justifiable use of force defense. DeSchon claimed his conviction should be reversed because his counsel's failure to investigate stemmed from a misunderstanding of the law pertaining to the admissibility of character evidence. DeSchon also claimed his counsel were deficient in not calling Manghan to testify to Lawrence's prior consistent statement regarding the time and place of his meeting with Azure.

¶15 The District Court concluded trial counsel's understanding of the rules of evidence was correct and their performance in presenting DeSchon's defense was reasonable and

competent. The District Court also concluded that even if Hood and Gersovitz's failure to investigate had been unreasonable, DeSchon did not show he was prejudiced.

## STANDARD OF REVIEW

¶16    The standard of review of a district court's denial of a petition for post-conviction relief is whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Morgan*, 2003 MT 193, ¶ 7, 316 Mont. 509, ¶ 7, 74 P.3d 1047, ¶ 7. Because ineffective assistance of counsel claims constitute mixed questions of law and fact, our review is de novo. *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, ¶ 9, 183 P.3d 861, ¶ 9.

## DISCUSSION

¶17    *Issue 1: Did the District Court err in denying post-conviction relief based on ineffective assistance of counsel because trial counsel did not adequately investigate and present evidence of the victim's propensity for violence?*

¶18    The right to counsel guaranteed by the Sixth Amendment to the United States Constitution and by Article II, Section 24 of the Montana Constitution encompasses the right to the effective assistance of counsel. *Whitlow*, ¶ 10. This Court adopted the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), to determine if an ineffective assistance of counsel claim is substantiated. *Morgan*, ¶ 9. The *Strickland* test requires the defendant to show, (1) his counsel's performance was deficient, and (2) this deficiency was prejudicial to the defense. *Morgan*, ¶ 9. If the defendant's evidence is insufficient to prove one prong of the test, analysis of the other prong is unnecessary. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

6

¶19     Under the first prong of the *Strickland* test, the defendant must show "counsel's conduct fell below an objective standard of reasonableness." *Whitlow*, ¶ 20; *Strickland*, 466 U.S. at 687-88, 104 S. Ct. at 2064. Courts are highly deferential to counsel's performance. A strong presumption exists in favor of finding trial counsel's actions are within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Courts must also judge the reasonableness of counsel's conduct on the facts of the particular case and resist the urge to review the attorney's conduct with the benefit of hindsight. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

¶20     If the defendant is successful under the first prong, the court must then determine if the defense was prejudiced by counsel's unreasonable actions. *Strickland*, 466 U.S. at 691-92, 104 S. Ct. at 2066-67. The defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

¶21     DeSchon claims he was prejudiced by two deficient actions of his counsel: (1) failing to investigate and present evidence at trial of Azure's propensity toward violence based on a misunderstanding of the law regarding admissibility of character evidence; and (2) failing to call Manghan to rehabilitate Lawrence's inconsistent statement.

¶22	DeSchon asserts the plain language of M. R. Evid. 404 and 405 allows unlimited introduction of character evidence when the character of a person is an "essential element" of the charge. DeSchon argues trial counsel should have investigated and presented testimony from DeSchon's family members who would have testified Azure was a violent individual who became more aggressive when he was drinking or taking drugs by referring to specific incidents when Azure displayed his violent character.

¶23	Defense counsel's duty is to make reasonable investigations or make a reasonable decision that further investigation is unnecessary. *Weaver v. State*, 2005 MT 158, ¶ 17, 327 Mont. 441, ¶ 17, 114 P.3d 1039, ¶ 17. When defense counsel is accused of failing to investigate adequately, the focus is on whether the information obtained from such an investigation would have produced a different result. *Weaver*, ¶ 21.

¶24	DeSchon is correct that his trial counsel had a duty to reasonably investigate—or make a reasonable decision not to investigate—Azure's violent behavior when they decided to advance a justifiable use of force defense. However, DeSchon's interpretation of Montana law regarding the admissibility of evidence showing reasonableness of force is incorrect. Evidence of a victim's character is admissible when it is an essential element of a claim or when it relates to the reasonableness of force used by the accused. M. R. Evid. 405(b); *State v. Sattler*, 1998 MT 57, ¶ 44, 288 Mont. 79, ¶ 44, 956 P.2d 54, ¶ 44. Evidence of a violent character is not an "essential element" of a justifiable use of force defense. *Sattler*, ¶ 45. Evidence of the violent nature of the alleged victim of an assault is limited to what the defendant knew at the time he used force against the victim, and it is also required that the defendant show this knowledge led him to use the level of force he did. *Sattler*, ¶ 46; *State v.*

8

*Montgomery*, 2005 MT 120, ¶ 19, 327 Mont. 138, ¶ 19, 112 P.3d 1014, ¶ 19. In *Montgomery*, we held that because the defendant failed to establish his knowledge of the victim's violent past led him to use the level of force he did, the evidence was "irrelevant and inadmissible." *Montgomery*, ¶ 20.

¶25 DeSchon's lawyers' decision to not investigate further into Azure's violent past was based on a correct interpretation of Montana law. Hood's understanding that the admissibility of Azure's specific violent bad acts was limited to what DeSchon knew at the time of the stabbing is consistent with this Court's interpretation of M. R. Evid. 404 and 405(b). *Montgomery*, ¶¶ 16-19; *Sattler*, ¶ 46. The testimony clearly established that DeSchon was aware of Azure's propensity for violence. Yet, there is nothing in the record indicating DeSchon knew about the specific incidents of violence he now alleges his family members could have testified to. Thus, there is no evidence DeSchon stabbed Azure based on these alleged incidents, and such testimony would be inadmissible. *See Montgomery*, ¶ 20. DeSchon's counsel were not ineffective because they did not investigate and attempt to adduce inadmissible testimony. Further, additional evidence from family members about past violent encounters with Azure would add little to the picture painted at trial by the nine witnesses who testified Azure was violent, had beaten DeSchon, and was not afraid to do it again.

¶26 In sum, trial counsel's decision to limit their investigation into Azure's violent past to what their client knew at the time of the stabbing did not fall below an objective standard of reasonableness because it was soundly based in Montana law. Because we do not conclude

9

trial counsel's actions were unreasonable, consideration of the second *Strickland* prong is unnecessary.

¶27    *Issue 2: Did the District Court err in denying post-conviction relief because DeSchon's counsel did not attempt to rehabilitate the witness Lawrence with a prior consistent statement?*

¶28    DeSchon claims his trial counsel's representation fell below an objective standard of reasonableness because they failed to call defense investigator Manghan to testify as to Lawrence's prior consistent statement that he had met Azure at a bar and not at his apartment.

¶29    Our inquiry into this issue is based on whether calling Manghan to testify on this point was reasonable or based in sound professional judgment. *Whitlow*, ¶ 20. The District Court concluded trial counsel made a "tactical decision . . . within the range of competence" when they chose not to question Manghan on this point.

¶30    DeSchon's trial counsel stated they did not call Manghan on this one point because they believed Lawrence's testimony at trial was credible. Further, counsel decided that Detective Whitcomb's testimony regarding where Lawrence met Azure on the night of his death was not particularly significant as the point of his testimony was to establish that Azure was drunk and violent on the night in question. Gersovitz decided the inconsistency was a "minor point" and did not think calling Manghan to testify was worth it.

¶31    This Court's review of the record does not allow us to step into trial counsel's shoes and gage whether Lawrence appeared credible to the jury. The determination is not whether this Court agrees with trial counsel that not calling Manghan to testify about a prior

10

statement made by Lawrence was a minor point. *See Whitlow*, ¶ 21; *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. The question is whether the decision of trial counsel was so unreasonable as to fall below an acceptable standard of legal representation. After our review of the record, we conclude the District Court did not err in its decision that DeSchon has not overcome the strong presumption trial counsel's conduct fell within the wide range of reasonable professional assistance and sound trial strategy. *See Whitlow*, ¶ 21. Again, because we do not conclude trial counsel's actions were unreasonable, consideration of the second *Strickland* prong is unnecessary.

## CONCLUSION

¶32    Our de novo review does not establish that DeSchon's trial counsel were ineffective.

¶33    Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON